Judge Ewing
delivered the Opinion of the Court.
Todd purchased of Waller, as the agent of Breckinridge, a tract of land of about five hundred acres, lying in Gallatin county. Todd afterwards agreed with Talbott, to let him into an equal interest in the purchase, upon his paying him one half of the purchase money.
An action of ejectment was prosecuted in the name of Breckinridge, against one Buchannon, who was in possession of the land, at the time of Todd’s purchase, for its recovery. A judgment being obtained, and commissioners appointed to assess the value of improvements and rents, under the occupying claimant laws, reported a balance of one thousand and eighty dollars, in favor of Buchannon, after deducting rents. Todd—who seems to have managed the whole business — executed a bond to the occupant, for the amount assessed, payable in one and two years, dated the 24th of November, 1818.
Waller made a deed to Todd and Talbott, for the land, in July, 1818, to hold as tenants in common.
In October, 1820, Talbott made a contract with Doc *191 tor Talbott, by which he agreed to exchange his interest in the land with him, for certain lots in Louisville; which was afterwards, in 1823, rescinded.
In 1828, Todd filed his bill in chancery, in the Gallatin Circuit Court, for a division of the land; in which he alleged that Talbott had taken possession of the improved part of the land, on the lower end of the tract, immediately on the recovery thereof from Buchannon, and had enjoyed the rents and profits thereof ever since, under an agreement between them, that he should pay Todd the sum of money paid by him to Buchannon, and keep that part of the tract, in the division. And that he (Todd) in pursuance of said agreement, had entered on the upper end of the tract, and made lasting and valuable improvements thereon. That a balance of the consideration, of eighty-two dollars twelve and a half cents, was due from Talbott, and also, twenty-one dollars forty-nine cents, his part of the tax — state and direct, paid by Todd, in 1815 and 16.
Process was served on Talbott in Franklin, and he failing to answer the bill, it was taken for confessed, and a decree rendered in favor of Todd, for a division of the land, assigning to Talbott the lower end; also, for the whole amount paid by Todd to Buchannon, and interest thereon from the 24th of November, 1818, and the aforesaid sums claimed for the balance of the consideration, and taxes paid, with interest on both sums.
At a subsequent term of the Court, on the motion of Talbott, the decree was set aside, and Talbott’s answer filed, in the nature, of a cross bill.
Todd answered the cross bill, in which he contended, that the decree was final, and controverted the power of the Court to set it aside.
Talbott turned his attention to the preparation of his defence, upon the merits; in which he pretty clearly established that, by an agreement between Todd and Doctor Talbott, while he held Isham Talbott’s interest in the land, Todd was to take the upper end of the tract, and Doctor Talbott the lower end, including Buchannon’s improvements, and Todd was to have, in addition to his own moiety, forty-six and a half acres adjoining *192 Jand, at twenty dollars per acre, as a full compensation for the moneys expended by him, in paying Buchannon for his improvements, and the parties had run the line and taken possession, on each side, under the agreement, and it had been invariably acquiesced in, by Todd and Doctor Talbott, while he held an interest in the land, and by Isham Talbott after the rescission of the contract with the Doctor.
The case coming on to be heard at the Nov. term, 1829, the Circuit Court determined that the first decree was rendered final, and out .of the power of a subsequent term of the Court, and annulled the subsequent order setting it aside and admitting the answer of Talbott, and struck the case from the docket. Both this and the first decree was taken to the Court of Appeals by Talbott, and the principles of both decrees sustained; but the first decree corrected as to running interest, and as to another particular, not essential to the merits of this controversy to be mentioned.
Upon the return of the cause to the Circuit Court, Talbott filed an original bill impeaching the decree for fraud; in which he alleges, that he was at first astonished when the subpoena was served upon him; but upon reflection, concluding that the object was a friendly suit, to obtain a formal.division of the land, knowing, as he did, that no other cause of action existed in Todd’s favor, against him; and having the utmost confidence in his fairness and integrity, he thought it unnecessary to give any attention to the suit, as the division would be made according to the agreement between Doctor Talbott and Todd — he failed to file his answer, and was astonished when an execution came out against him for a large sum of. money. That he immediately drew up his answer, and at the next term of the Court, attended, and exhibited it to Todd, and, after some solicitation, he agreed, that the decree might be set aside, and the answer filed. That they both attended the Court together, and the order was made accordingly, in the presence and by the assent of Todd. But he intimated that it was not necessary for it to appear, on the face of the order to be done, by his consent. That after he left the *193 Court, Todd taking advantage of this omission in the order, and bent upon carrying into effect his original fraudulent purpose, had shamefully violated his contract, and controverted in his answer to his cross bill, the power of the Court over the decree. That Todd, in his original bill, taking advantage of his misplaced confidence in him, had fraudulently filed his bill in a distant Court from his residence, and under the pretence of obtaining a division of the land, which he was at all times willing to make, had, as incidental thereto, set up a false and fraudulent claim for demands which he knew had been long since satisfied, and others which had no existence in fact, and fraudulently suppressed and kept out of view, credits which were known to him, and unknown to Talbott. That after he obtained the possession of the land from Buehannon, he being absent the greater part of the year in the public service, and when at home, living at a distance, and Todd having the entire management of the business, had — as he had discovered since the hearing of the cause — rented the place to John Waller, for the year 1819, and received from him two hundred and twenty-five dollars in rent, and to Joseph Moore, for the year 1820, and received two hundred dollars rent, in advance, and had also received ten dollars for the rent of a field, from another tenant, in one of those years; and not accounted for any part of those demands, but fraudulently withheld all knowledge of them from him.
The judgment or decree of a court of competent jurisdiction is, in general, final and conclusive—not only as to all matters determined by it, but as to all incidental matters which might have been properly litigated and decided in the same suit. But-
Todd answered the bill, denying in general terms all fraud in obtaining the decree, but making no denial to any of the specific facts charged, only that he had not received the rents charged against him.
Talbott filed exceptions to the answer, which were overruled by the Court, and the bill dismissed; and Talbott has again brought the case to this Court.
It is undoubtedly true, that the judgment or decree of a Court of competent jurisdiction, is not only final, as to all matters determined by it, but is also, in the general, final, as to every other matter incident to the cause, *194 which the parties might have put in issue and had litigated.
To the above rule there are exceptions; as where the judg’t or decree was obtained by fraud, or where there is a discovery of new evidence of a permanent and unerring character, or of new matter, of which the party, tho’ diligent in his enquiries, was ignorant till after the hearing; in such cases, the decree may be corrected or annulled—by bill impeaching it for fraud, if it was obtain’d by fraud; in other cases by bill of review. But—
The bare omission, perversion, or misrepresentation, of facts in a bill, is not such fraud as will subject the decree to impeachment; nor will any misconception on the part of a defendant, as to the ground, characacter or object of a suit which he fails to defend, be ground for opening the case after a decree; nor will a suggestion that the court adopted an improper decree through misplaced confidence in the person who drew it up.
This rule is founded in reason and propriety. It imposes only the exercise of reasonable vigilance; tends to advance the ends of justice; to quiet the contentions of society, and to put an end to vexatious litigation.
But there are undoubtedly exceptions to this rule: as where the judgment or decree has been obtained by fraud, which vitiates the most solemn determination of the Courts, or where new evidence has been discovered, of a permanent and unerring character: as a deed or other writing, and which by the exercise of reasonable diligence, could not have been discovered and used on the trial; or where new matter has been discovered, though it lies in parol, which was unknown before, and consequently not put in issue, or determined on by the Court.
In all these cases, it is well settled, by a current of decisions, that a decree may be revised, reviewed, corrected or annulled: in the first case by a bill impeaching the decree for fraud; in the two latter, by a bill of review. But the bare omission, perversion or misrepresentation of facts in a bill, will not constitute fraud, or subject the decree to impeachment on that ground. If so, there would be but few decrees that would not be subject to be overhauled, as there are perhaps but few bills, that do not contain some omission or perversion of truth.
The service of process upon the defendant, is a warning to him to appear and contest the matters set up in the bill; to controvert and correct the errors and false statements, and lead the Court to a just conclusion in the case. If he fail to do so, when the matters of defence are within his knowledge and reach, it is his own fault. He is placed in the attitude of an antagonist, by the commencement of a suit against him,and must rely upon his own resources, and not confide in his opponent for a fair and correct representation of facts. His failure, therefore, to defend the suit, on the ground of misplaced confidence in the complainant, or of a reliance upon his own opinion, that the suit was a friendly one, and that there were no matters of hostile litigation between them, will not constitute, of themselves, grounds for impeaching the *195 decree for fraud, or reviewing and uprooting the solemn determination of the Court. Nor will a charge that the decree was drawn up by the complainant, and obtained by imposing on the easy credulity of the Court, avail. It can matter not by whom it was drawn up, if sanctioned by the Court, and spread upon the record as his decision.
Where a comp’t has a knowledge of any material fact which he is morally bound to communicate to def’t, but conceals it, & goes on and obtains a decree, the def’t, without fault or neglect, remaining ignorant of those facts, which would have prevented the decree—there is good ground for a bill of review, or a bill to impeach the decree for fraud. For—
But if the defendant, without his fault or laches, is ignorant of a material matter of defence, which is known to the complainant, and artfully concealed by him, from the defendant, when it was his moral duty to communicate it to him, by reason of the confidential relationship between them, such artful device, is a fraud on the defendant. And though it should be carried out and consummated by the decree of the Court, ignorant of the device, it will not sanctify the fraud, or elevate it so high as to place it beyond the reach of a chancellor.
If a matter unknown to the defendant, at the hearing, will justify a bill of review; if such matter be within the knowledge of the complainant, and artfully suppressed by him, and withheld from the knowledge of the defendant, such suppression of the truth cannot lessen the right of the defendant, to ask for a review of the decree, and we think for its impeachment for fraud, especially as to the matter at least, so artfully suppressed.
Applying these principles to the case under consideration: Todd took upon himself, and was intrusted with, the management of the suit with Buchannon; the taking possession of the land, and renting it out; the execution of bond, in his own name, for improvements; and, as the confidential agent and bailiff of the co-tenants, with the reception and application of the profits, if any, and liquidation of the whole accounts relating to the land. While thus confided in and trusted, it is unquestionably established, by two witnesses to each item, with corroborating circumstances, that, in the years 1819 and 20, he received, in rents, the amounts charged in Talbot’s bill. That those amounts were received after the execution of the bond for improvements, and before the last instalment became due, at least, and in part before the first became due, and should, in fair dealing andgood conscience, *196 have been applied as credits to the reduction of the same: yet he made no such application of them, but concealed them from Talbott, and suppressed them in his bill. Tal-bott alleges his total ignorance of those items of credits, and shows, by the circumstances of the case, as we shall presently attempt to demonstrate, that he was in fact ignorant of their existence, and therefore, was not put upon inquiry for proof to establish them.
Fraud will vitiate any act,however solemn; and the suppression of truth, as well as the assertion of falsehood, may constitute fraud.
Under these circumstances, Todd has obtained a decree for the whole amount, paid by him, for improvements. Shall this decree stand and Talbott be concluded by the decree, and made to lose those credits? We think it ought not. Justice and fair dealing will say, that it ought not. If set up by Talbott, it certainly would have formed a good defence, to the extent of the complainant’s recovery. Had he appeared to the suit, he could not have set it up, as he was ignorant of its existence, and kept in ignorance by the wrongful conduct of Todd.
Had Todd settled the accounts with Talbott, and taken his bond for the balance due, for improvements, by suppressing the amounts received for rents, it would be obvious, that Talbott would be entitled to relief against the bond. So also, if, by the same ignorance on the part of Talbott, and suppression of truth on the part of Todd, he had consummated his purpose, by obtaining a decree, it would be equally subject to be impeached. For there is no act, however solemn, that may not be impeached, if vitiated by fraud: and fraud consists in the suppression of truth, or the representation of falsehood.
So, if Todd had held Talbott’s bond, for the direct payment of five hundred dollars, and some other, unknown to Talbott, had settled and paid the one half of the amount, and Todd suppressing the credit, had recovered a judgment at law for the whole sum, upon the proof of these facts, a court of common law, would not hesitate to grant a new trial, if applied for, during the term. And it is said that, the powers which a court of common law may exercise, in granting a new trial, upon the discovery of new matter, may be exercised by a court of chancery by bill of review, after the term.
A party who seeks to open a decree upon the discovery of matter, unknown to him till after the decree was rendered, is not held to very strict proof—either of his ignorance of the existence of the new matter, or of his industry in making enquiries which might have led to the discovery: much less vigilance will he required of him, than of a party who, having put facts in issue, relies on a failure to find the proof to sustain them.
Recital of facts and circumstances held sufficient to justify the conclusion, that a party was ignorant of the matter upon which he founds a hill of review, until after the decree, and his ignorance not imputable to such neglect or laches as will preclude his right to impeach the decree on the ground of fraud, or to maintain a hill of review.
But it is contended, that the proof is insufficient to establish Talbott’s ignorance of the existence of the demands for rent, and if he did not know of them, he was guilty of laches in failing to inform himself.
First—we would remark that, want of knowledge of a fact is a negative, and is not susceptible of direct proof. And, secondly, that the same force of evidence would not be required to establish due diligence in the discovery of matter unknown to the party before, as would be required in the discovery of evidence to sustain a matter, which was before known and put in issue.
In the former case, being wholly ignorant of the existance of such matter, he would not be put upon the lookout; but, in the latter case, having put the matter in issue, and being apprised of the necessity to sustain it, he would be put upon the inquiry, and it would be his duty, to make every reasonable exertion to search out the proof to sustain it. If he stakes his case upon the evidence adduced, the courts will not lightly indulge him in mending his hold, and re-trying the same matter.
Now it appears clear from the proofs and the admitted and unanswered allegations of the bill, that the whole management of the business was confided to Todd; that Talbott was absent in Congress, the greater part of the years when these transactions took place; and when at home, lived at a distance from the land; that, in the fall of 1820, he sold out to Doctor Talbott, and had no farther interest in it, and of course gave no farther attention to it, until 1823, when he rescinded the contract, and took back his interest in the land.
It does not appear that he ever knew when Todd got possession of the land from Buchannon, or when, or to whom, he rented, or whether he had obtained the possession, and rented it at all, before he sold out to the Doctor. Talbott was, therefore, not in a situation to know the facts, and if he ever spent any thoughts about the profits, he would have been drawn from an inquiry into them, by the confidence which he reposed in Todd, and the conviction, that they would be faithfully applied to the extinguishment of the claim for improvements: of which, it appears,he was apprised. Besides, it sets badly in the *198 mouth of Todd, to charge Talbott with laches, in failing to inquire into matters, which had been intrusted to him, as an accredited bailiff and confidential agent, and which it was his moral duty fairly and honestly to communicate to him.
Granting an injunction by a Judge at chambers, is tantamount to giving leave to file the bill.
That a bill was filed without leave, contrary to the rules of practice, will not be fatal at the bearing,when no advantage has been taken of it before, and the bill has merits.
Bar by time set up, and answer to that defence.
That he did not know of those matters, is strongly evidenced, by the circumstances, that when driven to defend, or to make an effort to defend, Todd’s bill, under circumstances well calculated to arouse his energies^ and call forth his best exertions, to present all the matters of defence in his power, that he made no mention in his answer whatever of the rents.
We therefore conclude, that he did not know of this matter, and that he was guilty of no such laches as will preclude him from inquiring into them, or impeaching the decree on the ground of fraud, or by bill of review.
The bill, in this case, in substance possesses all the essential requisites of a bill of either or both characters, except that it has not been filed by any formal leave of the Court. But before it was filed, the bill was presented to the judge, at his chambers, and an injunction granted, restraining all proceedings upon Todd’s decree, which must be regarded as tantamount to leave to file the bill. If not, his act was a useless one, as the injunction could never be availing, unless the bill was filed. Besides, we do not incline to hold a party to a very strict observance of the technical rule of practice, which requires special leave of the Court for filing a bill of review; especially, where equity is discovered, on the final trial, to be on the side of the complainant on the merits, and no objection has been made to the bill on that ground before.
But it is contended that, Talbott’s right to the rents was barred by the statute of limitation, and, as a matter of defence, would have been unavailing.
To obviate the statute, three grounds are relied on:
First — That the fund was held by Todd, in trust.
Second — That he was guilty of fraud, and that the statute does not commence running, in equity, until after the discovery of the fraud.
Trust is a very comprehensive term—embracing a vast variety of cases where money or property has been received by one party for the use of another; and as to most of which, the rights of the parties may be enforced at law, or in equity. Where the trust may be enforced at law, the statute of limitations will bar the action, and ill all such cases the bar will be applied in equity also. But there is a class of trusts of which equity has exclusive jurisdiction; and to these, no bar by lapse of time is applied.
The demand of one co-tenant for his share of the rents received by another,might be enforced by the action of account —within 5 years, not after: the same time will be a bar in equity-
The time that bars a bill in eq. to be relieved against a fraud, is computed from the discovery of though the case may be such that be remedy an action at law, which the statute of limitations would bar by time, commencing when the fraud was perpetrated.
And, third — the connection -of the demands for rents and improvements, will save the running of the statute.
Although there have been some loose decisions and dicta to the contrary, it is now well settled, by the more enlightened authorities, that the trusts which are not to be effected by the statute, in courts of equity, are those continuing and abiding trusts, which are not at all cognizable at law, but fall within the proper, peculiar and exclusive jurisdiction of chancery.
The word trust is a comprehensive term, and will embrace all cases where money is received on deposite, or collected as bailiff, agent, attorney or factor, together with a numerous class of cases, of every day occurrence, involving the most common tranasctions of society.- All of which are direct trusts, and may be enforced in equity or at law. It will not be seriously contended, that the statute will not apply as a bar in such cases. The case before the Court, is embraced in the same class of cases, and is subject to the same rule. The action of account will lie for its recovery, as will be presently shown, as well as a suit in equity, and there is a statutory limitation to this action, which should be permitted to operate as a bar, whether remedy is sought in the one tribunal or the other.
Chancellor Kent, in the case of Kane vs. Bloodgood, 7 John. Chy. Rep. 106, has bent his great mind to the investigation of this subject, with a patient and laborious research and energy of purpose which entitles his opinion to great repect, and has come to the conclusion, which we have adopted, upon this point.
But, secondly, there has been some diversity of opinion in the application of the statute in cases of fraud. Some contend that, the same rule should be adopted in equity 5 as at law, in all cases but those that are peculiarly cognizable in chancery. Others contend, that the Chancellor will not permit the statute to commence running until after the discovery of the fraud, in any case in which remedy is sought in his tribunal, though a court of common law may have concurrent jurisdiction.
*200 We incline to adopt the latter opinion, as the most rational, and best sustained by authorities.
It is not to be controverted that the statute of limitation, as a rule of strict law, does not apply to courts of equity. Those courts are, therefore, not bound to regard them. But courts of equity have adopted them, and fixed the same period prescribed by the legislature beyond which they will not, in the general, indulge the laches of a party.
But in the adoption of this rule, as a mere creature of equity, it is not surprising, that an exception should be made, in those cases where no laches can be imputable until the discovery of fraud, by which the claim of the party has been concealed by the device of his adversary.
In the case just referred to, Chancellor Kent uses this language. “It is well settled, that the statute does not run until the discovery of the fraud; for the title to avoid it does not arise until then, and pending the concealment of it, the statute ought not in conscience to run.”
Lord Redesdale, in the case of 2 Sch. & Lef. 634, in giving a reason why the statute ought not to apply in equity, in cases of fraud, where it has been concealed by one party, says “that the statute ought not in conscience to run, the conscience of the party being so effected that he ought not to be allowed to avail himself of the length of time.”
In the case of Troop vs. Smith, 20 John. Rep. 47, the Court say, “Courts of equity,not being bound, by the statute, any further than they have seen fit to adopt its provisions, as a reasonable rule, and then only in analogy to the general doctrines of that court, are perfectly right in saying, that a party cannot in good conscience, avail himself of the statute when, by his own fraud, he has prevented the other party from coming to a knowledge of his rights, until within six years prior to the commencement of his suit.”
Some of these cases are, it is true, dicta, in which the question was not directly involved; yet, they prescribe a reasonable and equitable rule, and take the proper distinction between the attitude and powers of the two courts, *201 in the application of the statute. The one has adopted it, as a convenient rule, so far as it does not conflict with good conscience; the other is bound by it, as an absolute rule of law, and possesses no dispensing control over its provisions.
When mutual demands exist, and are of such character, or there is such connection between them, that the larger demand might be used, as a set off. to prevent any recovery in a suit upon the smaller one, tho’ the latter may have stood till the statute of limitations might be used to defeat any action upon it; yet, as the existence of the smaller demand is a virtual payment, pro tanto, of the larger, counter demand, and its application in that way might be compelled by suit, the statute of limitations can never be used or permitted so to operate as to extinguish it, and leave the counter demand in force.
*201 Indeed, the case of the concealment of a fraud, presents so hard a case, that Lord Mansfield, in the case of Bree vs. Holbeck, Doug. 654, sitting in a court of common law, said, there may be cases, too, which fraud will take out of the statute of limitations.
In the case of the First Massachusetts Turnpike Company vs. Field and others, the question arose on a replication of fraud and the concealment thereof, by the defendant: Parsons, C. J. held, that when the delay of bringing the suit, was owing to the fraud of the defendant, the cause of action against him ought not to be considered, as having accrued, until the plaintiff could obtain the knowledge that he had a cause of action; and if this knowledge was fraudulently concealed from him by the defendant, the Court would violate a sacred rule of law if they would permit him to avail himself of his own fraud.
These cases, although we cannot sanction the principle expressed, as applicable to a common law court, show the strong tendency in favor of the equitable exception, to the statute, which we have adopted. And the last case may be regarded as a case in point, in support of it; as in that state, there is no courts of equity, and the equitable exception was enforced in a court of law. We have said that Talbott was unapprised of the rents, and Todd, in the attitude which he occupied, was guilty of concealment and a suppression of the truth, in failing to apprise him. He should not, therefore, be permitted to avail himself of his own wrong, to defeat a recovery.
But, thirdly — we think the connection between the demands for rents, and improvements, will save Talbott from the operation of the statute.
By the statute 4th and 5th Anne, c. 16, the action of account was given, by one joint tenant, or tenant in common, as bailiff, for receiving more than comes to his share of the profits. And by a statute of Virginia, passed in 1748, a similar provision was enacted. Statute law of *202 Kentucky, 315; which latter statute, it has been, determined by this court, (3 Bibb, 212,) was in force in this State. To the action of account our statute has applied the limitation of five years.
But had the action of account been brought, by Talbott against Todd, for his share of the rents, though Todd might not have been authorized to plead in bar of the action, that there was a larger amount due him, as bailiff, for sums expended in paying for the improvements, it is believed that he could have relied upon this matter, before the Auditors appointed under this mode of proceeding, for the settlement of the .accounts. If so, as the amount which he had paid out for the improvements, at all times exceeded the amount of rents received by him, it would at all times have barred him from recovering a judgment for the amount. He could, by suit, have forced its application, to the extinguishment, of an equivalent amount of the rents, but never could have obtained a judgment for its recovery. It is therefore believed that the statute would never bar Talbott’s right of action for it, or any portion of it, while an excess for the improvements remained due from Talbott to Todd.
By reason of the connection of the demands, it would have been treated as a payment of a portion of the larger demand of Todd. Whether this view be correct or not, it is certain, in a court of chancery, which has long assumed and exercised jurisdiction in the settlement of accounts between joint tenants and tenants in common, and whose jurisdiction may now almost be regarded as exclusive, (as the action of account has grown out of use, at least, if not become entirely obsolete,) that the minor demand, for rents, would never have been barred by the statute, while a larger demand, due from Talbott to Todd, for improvements made on the same land, paid out by Todd, in the management of the same estate, remained unextinguished. But always would have been applied by the chancellor, in extinguishment of its equivalent amount of the larger demand.
The sum received by Todd, for rents, by equitable implication, would be understood, as received by him, and retained and applied inpayment of so much of the amount *203 for improvements before paid out by him; and the statute, would never bar it. 3 Bibb, 460, Terril's Adm's. vs. Southall’s Ex’r.
In general, where a party succeeds upon a bill of review, or a bill impeaching a decree for fraud, the decree is set aside and annulled, and the parties are permitted to commence de novo. This must be the case whenever the new matters are inseparably connected with those on which the decree is founded. But there are exceptions, and, here, where the new matter does not affect the of the original decree, but consists of counter demands, extinguishing, pro tanto, those upon which the decree was founded, held that the decree impeached—especially, as, if it were annulled, the demand might be barred by time—should be permitted to stand—subject to such reduction as the new matter may require; and, to that extent, there should be a perpetual injunction against the original decree.
It is not believed, that the action of assumpsit could ever have been sustained by one joint tenant, or tenant in common against another, for rents received, upon an implied promise. But if it could, when money is received by one man for the use of another, the law implies a promise to pay, because it is equitable that the one should pay, and the other receive it. But it would not be equitable for Talbott, to exact payment for the rents, while a large balance remained against him, on the account between him and his co-tenant, which had accrued in the management of the same estate. It would rather imply — as it would be more equitable — that the rents were applied to extinguish its equivalent amount of the sum due Todd. If so, the statute, in this action, would not bar it. See Crutcher vs. Trabue, decided at this term. [Ante, 82.]
But the question is presented, and with which we have had some difficulty — what shall be the character of relief that will be afforded? Shall the whole decree in favor of Todd be set aside, and Talbott be permitted to file his answer, and the case be commenced de novo, at some point prior to the decree? or, shall the amount of rents, to which Talbott is entitled, be set off against so much of the amount decreed Todd?
We readily concede that,it is most generally the practice, in a decree on a bill of review, or on a bill for fraud in the nature of a bill of review, to set aside and vacate the decree, and permit the parties to commence de novo. 3 J. J. Marshall, 536, Mayersback vs. Fauntleroy, &c.; 3 Littell's Rep. 88—9, Carneal vs. Wilson; Mitford's Pleadings, 84. But this, we believe, is not a universal rule. There are exceptions to it.
When the matters of review or fraud enter into the . . . decree, and intermingle themselves inseparably with it, it would, in all such cases, be proper, and, indeed, fre *204 quently indispensable, to set aside and annul the whole decree. But, as in the present case-, where the matter upon which the decree is impeached, is distinct, and the amount may be ascertained with precision, and no just ground to vacate the whole decree has been made out, and where so far as grounds have been made out, complete remedy may be afforded, by decreeing a set-off at once, and a perpetuation of the injunction for the amount; and especially, as Talbott, as to the rents, has only prayed for a set-off, and Todd might now, if his decree is uprooted, be barred as to a large amount of his demand, by the statute of limitation, and irreparable injury done him; it is thought to be the most appropriate relief in this case, as falling within an exception to the general rule, to permit the decree to stand, and to afford relief by set-off.
One of two tenants in common receives all the rents. A division of the estate is subsequently made, by agreement, and the improved part, which had produced all the rents, is allotted to the other co-tenant, who undertakes who had paid the whole sum adjudged to an adverse claimant for the improvements: there being nothing in that effect, it cannot be implied that, he who took the improved part was to have had been derived from it before the agreement; and his right against a co-tenant for a share of the rents, is for one half only, not for the whole. Nor does any right to the whole result from the fact, that interest was decreed against him, on the sum that he had agreed to pay on account of the improvements.
But the question is raised, whether Talbott is entitled to the whole, or only half, of the rents received by Todd,
We think he is entitled to his equal half only. The estate was held by them as tenants in common, when the rents accrued. As each had an equal interest in the estate, each had a right to an equal share in the issues and profits.
That the estate was afterwards divided, and the improved portion, out of which the rents had issued, assigned to Talbott, he agreeing to pay the amount which Todd had paid for the improvements, and that that amount with interest ha¿[ been decreed to Todd, can make no difference.
It cannot parties m rents, unless there was something in the contract about the improvements, that would change them.
We cannot imply that it was his contract, to pay for the improvements after deducting the rents. And there is no evidence that such was the contract,
That Talbott did undertake to pay what Todd had paid, cannot now be controverted by Talbott. He is concuded, as to this matter, by the decree.
Nor can he claim the who rents upon ground that, *205 interest was decreed in favor of Todd, on the sum paid by him for the improvements, running from a day prior to the accrual of the rents. The interest was decreed him upon his contract to pay the sum which Todd had paid, and as an incident to that undertaking; and not as an equivalent for the whole rents.
May 10.
Answer to petitions for a rehearing.
It is, therefore, the opinion of this Court, that the decree of the Circuit Court be reversed, and the cause remanded, that an estimate may be made of the interest upon the sum of two hundred and seventeen dollars and fifty cents, from the first day of January, 1820, up to the rendition of the final decree herein, and that the aggregate amount be set-off, against the like amount of said decree in favor of Todd, and for that amount of the decree, a perpetual injunction be awarded the complainant, with the costs by him expended; and the appellant is to have his costs in this Court.